THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 7:26-cv-00241-D-BM

| | | |
|---|---|---|
| WILLIAM BURNETT, individually and on behalf of all others similarly situated,<br><br>Plaintiff(s)<br><br>v.<br><br>MUTUAL OF OMAHA MORTGAGE,<br><br>Defendant(s) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **REPORT OF THE PARTIES' PLANNING MEETING**<br>Fed. R. Civ. P. 26(f) |

**REPORT OF THE PARTIES' PLANNING MEETING**

1. The following persons participated in a Rule 26(f) conference on August 10, 2026, by videoconference:

   Avi R. Kaufman and Ryan P. Duffy, representing the Plaintiff

   Nathaniel Haas and Oyinkansola Y. Muraina, representing the Defendant

2. Initial Disclosures. The parties will complete by October 14, 2026, the initial disclosures required by Rule 26(a)(1).

3. Discovery Plan. The parties disagree about the discovery required in this case:

   **(a)** In this putative class action, Plaintiff William Burnett alleges that Mutual of Omaha Mortgage ("Mutual") placed pre-recorded or artificial voice calls to his cellular telephone without his prior express written consent, in purported violation of 47 U.S.C. § 227(b)(1)(A)(iii). Discovery will be needed on these subjects: the parties' respective statements set forth below. The parties disagree as to the scope, sequencing, and focus of discovery.

**Plaintiff's Position**[1]**:**

Plaintiff anticipates serving discovery directed primarily towards Mutual of Omaha's defenses to Plaintiff's claims, identifying all parties involved in the making of prerecorded voice calls by or on behalf of Mutual of Omaha, including call records, information relating to instructions to make the calls, lead sources, do-not-call requests, Mutual of Omaha's policies and procedures relating to prerecorded voice calls, and information sufficient to identify call recipients. This written discovery will seek information maintained by Mutual of Omaha and any agent or vendors from whom Mutual of Omaha obtains products or services related to the calls. Plaintiff then intends to depose Mutual of Omaha relating to its defenses and the prerecorded voice calls at issue, and serve additional written discovery as necessary. Finally, Plaintiff intends to obtain written discovery regarding, and the depositions of, any experts retained by Mutual of Omaha in connection with Plaintiff's and the Class's claims.

Defendant Mutual of Omaha's accusations regarding Plaintiff Burnett and his counsel are completely false, baseless, and do not provide a reason to prevent discovery from proceeding in the ordinary course.

*First*, Plaintiff Burnett is not engaged in some salacious scheme to defraud Mutual of Omaha by implanting Mr. Burnett's telephone number on Mutual of Omaha's website only to file a TCPA suit.

---

[1] Plaintiff and his counsel are mindful that the joint report is not intended as a mechanism for the parties to litigate the merits of their claims. Plaintiff and Plaintiff's counsel deny the accusations and insinuations included within Defendant's statements below, all of which are speculative and unfounded. Plaintiff and Plaintiff's counsel have endeavored to respond to some, but not all of the allegations and arguments, including some added to a draft first transmitted to Plaintiff's counsel after 11:50 PM on September 29, the date before this report was due to be filed. Notwithstanding, Plaintiff and Plaintiff's counsel are prepared to defend themselves against any and all baseless accusations regarding the genesis of the lead that included Plaintiff's telephone number, any unsubstantiated misconduct in some other case in Oregon, or otherwise asserted by Defendant and its counsel at the Court's request or any other appropriate time.

To the contrary, Mr. Burnett is a 70 year old Southport, North Carolina resident who filed this lawsuit because Mutual of Omaha's incessant, unsolicited calls irritated him. Mr. Burnett did nothing to cause Mutual of Omaha to start calling him, and, despite his best efforts, Mutual of Omaha refused to stop calling him.

As background, Mr. Burnett has a B.S. in Mechanical Engineering from Duke University (1978), an MBA from The Wharton School of the University of Pennsylvania (1987), and a Masters in Engineering from the University of Michigan (2001). After college, he worked as a Nuclear Plant Engineer for Westinghouse Corporation in Idaho Falls, Idaho, a Nuclear Startup Test Engineer for General Electric Company, and as an independent contractor performing startup and outage recovery operations at nuclear power stations for Perry Nuclear Power Plant in Ohio and Pilgrim Station Nuclear Power Plant in Plymouth, Massachusetts.

In 1987, Mr. Burnett started working for Ford Motor Company in Dearborn, Michigan as a Business and Project Planner for new vehicles. In 1995, he transferred to work in Ford's Cologne, Germany office, and in 1999, he returned to Ford's Michigan office, where he worked until 2007.

It was during this second period at Ford in Michigan that Mr. started a data analytics company for automotive dealerships (Areva) with Ford's approval while continuing to work there. It was also during this timeframe, approximately twenty years ago—while living in Michigan—that Mr. Burnett obtained the 734 area code telephone number to which he received Mutual of Omaha's unsolicited calls that form the basis for this lawsuit. Indeed, the 734 telephone number was used by Mr. Burnett as both his personal cellular telephone number and Areva's telephone number until Areva ended operations in 2023, including when he moved in the early 2010s to Boston, Massachusetts, in the mid-2010s to Rockville, Maryland, and in the early 2020s to North

Carolina, where he continues to reside. Since 2023, Mr. Burnett has continued to use the telephone number exclusively as his only personal number, and has not had any other telephone number.

In January of 2026, Mr. Burnett started receiving unsolicited, pre-recorded calls about a reverse mortgage from Mutual of Omaha. All of Mutual of Omaha's pre-recorded messages included a toll free number for calling Mutual Omaha back. Mr. Burnett called this number when he started receiving the calls to attempt to get Mutual of Omaha to stop calling him, but the calls continued.

From January 22, 2026 until February 5, 2026—a fifteen day period—Mutual of Omaha made no fewer than 28 pre-recorded calls to Mr. Burnett:

- January 22, 2026 at 9:50 AM from 817-286-4758;
- January 22, 2026 at 1:52 PM from 817-286-4375;
- January 22, 2026 at 5:53 PM from 940-276-2476;
- January 23, 2026 at 10:01 AM from 817-286-4375;
- January 23, 2026 at 6:04 PM from 940-276-2476;
- January 24, 2026 at 10:49 AM from 817-286-4377;
- January 24, 2026 at 2:53 PM from 817-286-4375;
- January 26, 2026 at 2:50 PM from 817-286-4758;
- January 26, 2026 at 6:51 PM from 817-286-4758;
- January 27, 2026 at 10:15 AM from 817-286-4375;
- January 27, 2026 at 2:25 PM from 817-286-4758;
- January 28, 2026 at 10:18 AM from 817-286-4758;
- January 29, 2026 at 2:21 PM from 817-286-4758;
- January 29, 2026 at 6:26 PM from 817-286-4377;
- January 30, 2026 at 10:21 AM from 817-286-4377;
- January 30, 2026 at 6:27 PM from 817-286-4377;
- January 31, 2026 at 10:22 AM from 940-276-2476;
- January 31, 2026 at 2:24 PM from 940-276-2476;
- February 2, 2026 at 10:24 AM from 817-286-4375;
- February 2, 2026 at 5:29 PM from 817-286-4375;
- February 3, 2026 at 10:27 AM from 817-286-4375;
- February 3, 2026 at 1:28 PM from 817-286-4375;
- February 3, 2026 at 4:30 PM from 940-276-2476;

- February 4, 2026 at 2:14 PM from 940-276-2476;
- February 4, 2026 at 5:16 PM from 940-276-2476;
- February 5, 2026 at 10:17 AM from 817-286-4375;
- February 5, 2026 at 2:21 PM from 817-286-4377; and
- February 5, 2026 at 6:22 PM from 817-286-4377.

As a result, on February 5, 2026, Mr. Burnett sent a letter to Mutual of Omaha's Chairman and CEO making clear that he was receiving repeated, pre-recorded calls from Mutual of Omaha, that he did nothing to solicit the calls, that he did not want the calls, that he had tried unsuccessfully to make the calls stop, and that if the calls continued, he would have no choice but to initiate legal action.

Notwithstanding, Mutual of Omaha continued calling Mr. Burnett. In fact, from February 6, 2026 until April 9, 2026, Mutual of Omaha made more than 100 more pre-recorded calls to him:

- February 6, 2026 at 10:14 AM from 817-286-4375;
- February 6, 2026 at 2:16 PM from 817-286-4377;
- February 6, 2026 at 6:16 PM from 817-286-4377;
- February 9, 2026 at 10:17 AM from 817-286-4758;
- February 9, 2026 at 6:36 PM from 817-286-4375;
- February 10, 2026 at 10:08 AM from 817-286-4377;
- February 10, 2026 at 6:11 PM from 817-286-4375;
- February 11, 2026 at 10:00 AM from 940-276-2476;
- February 11, 2026 at 2:01 PM from 817-286-4375;
- February 12, 2026 at 10:09 AM from 817-286-4758;
- February 12, 2026 at 6:11 PM from 940-276-2476;
- February 13, 2026 at 10:09 AM from 940-276-2476;
- February 13, 2026 at 2:10 PM from 817-286-4758;
- February 13, 2026 at 6:11 PM from 817-286-4758;
- February 17, 2026 at 10:39 AM from 817-286-4375;
- February 17, 2026 at 2:45 PM from 940-276-2476;
- February 17, 2026 at 6:50 PM from 817-286-4375;
- February 18, 2026 at 10:31 AM from 817-286-4377;
- February 18, 2026 at 2:53 PM from 817-286-4375;
- February 18, 2026 at 6:54 PM from 817-286-4375;
- February 19, 2026 at 6:36 PM from 817-286-4758;

- February 20, 2026 at 2:14 PM from 817-286-4758;
- February 20, 2026 at 6:15 PM from 817-286-4377;
- February 23, 2026 at 10:27 AM from 817-286-4375;
- February 23, 2026 at 2:29 PM from 940-276-2476;
- February 23, 2026 at 5:30 PM from 940-276-2476;
- February 24, 2026 at 10:25 AM from 940-276-2476;
- February 24, 2026 at 2:27 PM from 940-276-2476;
- February 24, 2026 at 6:29 PM from 817-286-4375;
- February 25, 2026 at 10:28 AM from 817-286-4377;
- February 25, 2026 at 6:34 PM from 940-276-2476;
- February 26, 2026 at 10:22 AM from 940-276-2476;
- February 26, 2026 at 2:24 PM from 817-286-4758;
- February 26, 2026 at 6:24 PM from 817-286-4758;
- February 27, 2026 at 10:26 AM from 817-286-4375;
- February 27, 2026 at 5:28 PM from 940-276-2476;
- February 28, 2026 at 10:19 AM from 817-286-4377;
- February 28, 2026 at 2:28 PM from 817-286-4375;
- March 2, 2026 at 10:25 AM from 817-286-4377;
- March 2, 2026 at 2:28 PM from 817-286-4375;
- March 2, 2026 at 5:30 PM from 817-286-4375;
- March 3, 2026 at 10:11 AM from 940-276-2476;
- March 3, 2026 at 2:18 PM from 866-872-9056;
- March 3, 2026 at 6:19 PM from 817-286-4375;
- March 4, 2026 at 10:03 AM from 940-276-2476;
- March 4, 2026 at 2:11 PM from 817-286-4375;
- March 4, 2026 at 6:12 PM from 817-286-4375;
- March 5, 2026 at 10:02 AM from 844-474-9003;
- March 6, 2026 at 10:03 AM from 940-276-2476;
- March 9, 2026 at 10:14 AM from 940-276-2476;
- March 9, 2026 at 6:20 PM from 817-286-4375;
- March 10, 2026 at 10:01 AM from 940-276-2476;
- March 10, 2026 at 2:03 PM from 817-286-4375;
- March 10, 2026 at 5:04 PM from 817-286-4375;
- March 11, 2026 at 9:55 AM from 817-310-9829;
- March 11, 2026 at 1:56 PM from 817-286-4375;
- March 12, 2026 at 9:51 AM from 940-468-4040;
- March 12, 2026 at 12:53 PM from 817-286-4375;
- March 12, 2026 at 3:55 PM from 817-286-4758;

- March 13, 2026 at 9:59AM from 817-286-4758;
- March 13, 2026 at 1:00 PM from 817-286-4377;
- March 13, 2026 at 5:02 PM from 940-276-2476;
- March 16, 2026 at 9:45 AM from 940-276-2476;
- March 16, 2026 at 12:47 PM from 682-235-7764;
- March 16, 2026 at 4:48 PM from 817-286-4375;
- March 17, 2026 at 10:50 AM from 734-724-5131;
- March 17, 2026 at 3:01 PM from 734-724-5131;
- March 17, 2026 at 5:45 PM from 817-286-4377;
- March 18, 2026 at 10:21 AM from 734-724-5131;
- March 18, 2026 at 2:40 PM from 734-724-5131;
- March 18, 2026 at 6:50 PM from 734-724-5131;
- March 19, 2026 at 10:30 AM from 734-724-5131;
- March 19, 2026 at 2:40 PM from 734-724-5131;
- March 19, 2026 at 6:50 PM from 734-724-5131;
- March 20, 2026 at 10:31 AM from 734-724-5131;
- March 23, 2026 at 2:20 PM from 734-724-5131;
- March 23, 2026 at 6:31 PM from 734-724-5131;
- March 24, 2026 at 12:41 PM from 734-724-5131;
- March 24, 2026 at 4:50 PM from 734-724-5131;
- March 25, 2026 at 12:01 PM from 734-724-5131;
- March 25, 2026 at 4:12 PM from 734-724-5131;
- March 26, 2026 at 12:41 PM from 734-724-5131;
- March 26, 2026 at 4:50 PM from 734-724-5131;
- March 27, 2026 at 1:21 PM from 734-724-5131;
- March 27, 2026 at 5:30 PM from 734-724-5131;
- March 28, 2026 at 12:20 PM from 734-724-5131;
- March 28, 2026 at 4:30 PM from 734-724-5131;
- March 29, 2026 at 1:01 PM from 734-724-5131;
- March 29, 2026 at 5:11 PM from 734-724-5131;
- March 30, 2026 at 1:11 PM from 734-724-5131;
- March 31, 2026 at 1:12 PM from 734-724-5131;
- March 31, 2026 at 5:21 PM from 734-724-5131;
- April 1, 2026 at 1:40 PM from 734-724-5131;
- April 1, 2026 at 5:50 PM from 734-724-5131;
- April 2, 2026 at 1:20 PM from 734-724-5131;
- April 2, 2026 at 5:30 PM from 734-724-5131;
- April 2, 2026 at 5:40 PM from 734-724-5131;

- April 3, 2026 at 1:20 PM from 734-724-5131;
- April 3, 2026 at 5:31 PM from 734-724-5131;
- April 6, 2026 at 2:11 PM from 734-724-5131;
- April 6, 2026 at 6:21 PM from 734-724-5131;
- April 7, 2026 at 2:11 PM from 734-724-5131;
- April 7, 2026 at 6:21 PM from 734-724-5131;
- April 8, 2026 at 2:21 PM from 734-724-5131;
- April 8, 2026 at 6:31 PM from 734-724-5131;
- April 9, 2026 at 3:01 PM from 734-724-5131; and
- April 9, 2026 at 7:11 PM from 734-724-5131.

Now, after calling Mr. Burnett more than 100 times after he sent them a letter pleading for the calls to stop, Mutual of Omaha insinuates that Mr. Burnett visited Mutual of Omaha's website in January 2026 and implanted his telephone number with a series of other false information in an effort to generate a TCPA lawsuit. That is patently false.

Mr. Burnett did not visit Mutual of Omaha's website in January of 2026 before he started receiving Mutual of Omaha's calls. (Mr. Burnett does not believe he ever visited Mutual of Omaha's website before the filing of this lawsuit.) He also has never directed anyone to input his number on Mutual of Omaha's website and has no knowledge of anyone ever doing so.

Indeed, Mr. Burnett had no reason to, and did not, visit Mutual of Omaha's website before 6 am on Saturday January 17, 2026 or to input any of the information Mutual of Omaha claims was submitted. Mr. Burnett owns a townhouse with only 2 years remaining on the mortgage. The calls he received from Mutual of Omaha were about a reverse mortgage. He has never been interested in or applied for a reverse mortgage. Mr. Burnett does not know anyone named Jesse Brooks and has never used that name or any other alias. Mr. Burnett is similarly unfamiliar with and has never submitted as his own any of the other information included in the purported web submission. He has also never used a VPN to access the internet in his personal life. (It is possible

that as part of Areva's business he may have occasionally used a VPN. That would not have involved Mutual of Omaha or its website in any way.)

Mr. Burnett was not trying to entrap Mutual of Omaha. Until he started receiving Mutual of Omaha's calls, Mr. Burnett had never even heard of the TCPA or filed a lawsuit in his personal capacity. And if Mutual of Omaha had simply stopped calling him as he requested he likely would not have filed this action either.

There is therefore no reason at this time to limit discovery into Mutual of Omaha's false accusations predicated only on Mutual of Omaha's self serving speculation. Mutual of Omaha is free to take whatever proportional discovery it seeks on the genesis of the lead including Mr. Burnett's telephone number while Mr. Burnett pursues discovery regarding the scope of the putative class's claims.

*Second*, Mutual of Omaha argues that bifurcation is warranted based on a recent ruling in an Oregon case, *Wilson v. Freeway Insurance Services of America, LLC*, No. 6:25-cv-01869-MC (D. Or. Aug. 19, 2026), which Mutual of Omaha claims "concerns Plaintiff's counsel of record here, and which calls into question whether Plaintiff's counsel of record is adequate." But Plaintiff's counsel was not counsel of record (or otherwise involved) in *Freeway*; he did not brief Freeway's motion to deny class certification or appear at the hearing on that motion. Nor are any of the attorneys involved in *Freeway* counsel in this action. Plaintiff's counsel has not engaged in any fraud, and has not been accused of fraud in that proceeding. Mutual of Omaha instead attempts to link Plaintiff's counsel to *Freeway* through his appearance in *Wilson v. PacifiCorp*, No. 6:24-cv-01956-MC (D. Or.), a separate action that had been settled on a class action basis and that the Oregon court joined with thirteen other Wilson cases for purposes of class certification. The stay in *PacifiCorp* flowed from the *Freeway* court's class-certification order, not from a separate

finding concerning Plaintiff's counsel's conduct in *PacifiCorp*. Accordingly, Mutual of Omaha's assertion that the *Freeway* record calls Plaintiff's counsel's adequacy into question rests on an inference the record does not support.

There is therefore no basis in the record in this case or any proceeding in Oregon for bifurcating discovery and delaying Plaintiff from pursuing his putative class claim while he faces one way discovery into Mutual of Omaha's speculative assertions. And there is likewise no basis for the type of attorney-client privileged or third party discovery into the same issues that Mutual of Omaha previews.

The Court should therefore deny Mutual of Omaha's request for bifurcation.

**Defendant's Position:**

Mutual does not engage in cold calling. It calls people only in response to their affirmative inquiries. That is what happened here: someone using Plaintiff's (734) number submitted an inquiry through Mutual's reverse-mortgage web form. By doing so, that person requested a call and agreed to Mutual's terms of service, which include a Nebraska forum-selection clause. Mutual then did what the inquiry asked it to do: it attempted to contact him. That is why every call opened with "I'm returning your request about reverse mortgage information" or "I'm following up regarding your online inquiry for a reverse mortgage." Mutual continued to follow up because no one picked up the calls. *See Beard v. John Hiester Chevrolet, LLC*, 640 F. Supp. 3d 420, 429 (E.D.N.C. 2022) (Dever, J.) (consumer's prior express written consent given online defeated a TCPA claim); *Danehy v. Time Warner Cable Enters.*, 2015 WL 5534094, at *6 (E.D.N.C. Aug. 6, 2015) (granting summary judgment for the defendant based on good-faith reliance on a prior user's consent), *report and recommendation adopted sub nom. Danehy v. Time Warner Cable Enters. LLC*, 2015 WL 5534285 (E.D.N.C. Sept. 18, 2015).

Plaintiff claims he wasn't the one who filled out the form and requested contact. This fact

pattern arises from time to time in TCPA cases: a plaintiff claims someone else used his number either to avoid giving their real number or because they mistyped their own number. But this is not a typical case.

Mr. Burnett lives in North Carolina and claims that he received a series of calls to his telephone number, which has a Michigan area code. Defendant's investigation to date indicates that someone identifying as Jesse Brooks visited Mutual's website and requested to be contacted about a reverse mortgage. According to the information that Mr. Brooks provided, he lives in Denton, Texas, and is 72 years old. So far, so good. As discussed above, sometimes people accidentally mistype their telephone number when inquiring about a good or service, leading a business to, unbeknownst to it, call a number owned by someone else. Or sometimes, someone purposefully mistypes their telephone number so they can receive a quote for a good or service but not be contacted later on.

But that is where things get strange. Whoever claimed to be Mr. Brooks went to unusual lengths to avoid detection. To start, they provided an address to Mutual that does not exist. They provided an email address that does not work either: it is associated with Turkish Airlines' *inter-company* communication systems, so any email sent to it is returned as undeliverable. Any efforts to locate a 72-year-old man named Jesse Brooks, who resides in Texas and works for Turkish Airlines, have thus far failed. And the IP address that Mr. Brooks (or whoever claimed to be him) used to enter information in Mutual's system geolocates to a data center in Northern Virginia. In other words, nobody lives at the geolocated address in Northern Virginia, either.

So, is Mr. Brooks an incredibly private elderly gentleman who wanted nobody to contact him, even though the whole point of filling out the form is to be contacted by Mutual regarding a reverse mortgage for a home? Or did someone pretending to be Mr. Brooks provide a slew of bogus information with the single exception of a real number that belongs to Mr. Burnett? And if

so, why? Was it to generate calls to that number and thus a TCPA claim? To play a joke on Mr. Burnett?

Defendant does not claim to know the answer yet. Discovery has only just begun, and additional discovery is necessary to determine the submitter's identity. What the limited facts presently available do indicate is that whoever completed the form went to deliberate lengths to conceal their own identity—a nonexistent address, a non-working email, a residential-proxy IP—but decided for some reason to supply an accurate, working telephone number. Identifying that person is precisely what the threshold discovery Defendant proposes is designed to accomplish.

Plaintiff's reliance on his February 5, 2026 letter only underscores these problems. As an initial matter, Plaintiff did not send that letter to Mutual: he addressed it to the Chairman and CEO of a separate company, Mutual of Omaha, not to Mutual of Omaha Mortgage, the defendant here. But the letter also did not give Mutual the one piece of information needed to honor the very request it made: the telephone number Plaintiff wanted the calls to stop reaching. And although Plaintiff's counsel acknowledges that they were retained in March 2026 while the calls were ongoing and "had an employee send a demand for consent email to Mutual of Omaha on March 10, 2026" (Compl. ¶ 37), Plaintiff has not produced that correspondence or identified the email addresses used, despite Defendant's discovery requests on the issue. None of this makes much sense if all Plaintiff wanted was for the calls to stop.

Plaintiff also notably offers no plausible explanation for how his telephone number came to be in Mutual's system. He instead denies knowing anyone named Jesse M. Brooks and recounts his educational and personal background. But neither Plaintiff's education nor his career accounts for how his number was entered on Mutual's web form from a residential proxy alongside a fabricated name, address, and email. And, in any event, Defendant's position does not depend on Mr. Burnett having submitted the lead himself.

That's because, regardless of who did, this case cannot move forward, much less as a "class action." If Plaintiff or someone with a financial interest submitted the information to generate a TCPA claim, that would be fraud. *See Human v. Fisher Invs., Inc.*, 831 F. Supp. 3d 845, 853 (E.D. Mo. 2026) (describing litigant's conduct of providing his contact information under fake names to solicit calls as "a specific type of TCPA fraud"). If instead a random person input a bunch of fake information but Plaintiff's real phone number for no discernible reason, Mutual would not be liable for accidentally contacting the wrong person. *See Danehy*, 2015 WL 5534094, at *6 (granting summary judgment for defendant based on good-faith reliance on consent from someone else).

But regardless of what happened, there is one constant across all possibilities that confirms this case is not a viable class action: to get to the bottom of who submitted just this one lead form, an individualized analysis will be required. Written discovery, depositions, third-party discovery, a private investigator, and so on. That analysis would have to be repeated for every number Mutual called, since the company possesses facially valid consent to contact each one. That is the antithesis of a "class action," as individualized issues would swamp common ones, and Plaintiff would not be "typical" of any group of people subject to common treatment. *Compare Davis v. Capital One, N.A.*, 2023 WL 6964051, at *14 (E.D. Va. Oct. 20, 2023) (denying certification in TCPA case where call database consisted only of numbers for which prior consent had been obtained, making individualized consent inquiry the dominant issue), *aff'd,* 2025 WL 2445880 (4th Cir. Aug. 26, 2025), *with Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 394 (M.D.N.C. 2015) (granting certification based on allegations that defendant's authorized dealer called a list of solely non-consenting persons on defendant's behalf), *aff'd,* 925 F.3d 643 (4th Cir. 2019); *see also Smith v. ExamWorks, LLC*, 2026 WL 2823260, at *8 (D. Md. Sept. 21, 2026) (denying certification on typicality grounds where representative's claim did not share the class's ordinary consent method).

This all said, the parties agree that they need to get to the bottom of who provided Plaintiff's

number to Mutual and why. As explained further below, Mutual contends that investigation should be done first, before expensive and burdensome class discovery, the entire expense of which will fall on Mutual. It thus proposes phased discovery as further explained below, with the first 90 days limited to Plaintiff's individual claim. Because it is expedited, it will not impact the overall timeline of the case. Discovery during that first phase will include the following topics, among others that Plaintiff may wish to explore:

- The source, circumstances, and authenticity of the lead or inquiry associated with the telephone number at issue, including who submitted it, under what name, from what location, and when;
- Whether the submitter had any financial interest in calls being placed to the number, including the relationship between the submitter and Mr. Burnett and/or his counsel, if any;
- Whether Mr. Burnett, or a prior or other user or subscriber of the number (such as Mr. Brooks), consented to or invited the calls and agreed to Mutual's applicable terms and conditions, including an arbitration provision and class-action waiver;
- Whether and when the number was reassigned to Mr. Burnett, and any prior consent, inquiry, or established business relationship associated with the number;
- Whether Mr. Burnett suffered any concrete injury sufficient to confer Article III standing, including whether the calls he challenges were invited or manufactured; and
- Whether Mr. Burnett's claims are typical of, and whether he can adequately represent, the putative class.

**(b)** The parties agree that discovery will commence upon entry of the scheduling order and be completed by August 2, 2027. However, the parties disagree about the sequence and timing of discovery.

**Plaintiff:**

Plaintiff does not seek bifurcation or other sequencing of discovery and proposes the following deadlines:

Fact discovery cut off: May 14, 2027

Affirmative expert disclosures: June 4, 2027

Rebuttal expert disclosures: July 2, 2027

Expert discovery cut off: August 2, 2027

As stated above, Defendant Mutual of Omaha's accusations regarding Plaintiff Burnett and his counsel are completely false, baseless, and do not provide a reason to prevent discovery from proceeding in the ordinary course.

*First*, Plaintiff Burnett is not engaged in some salacious scheme to defraud Mutual of Omaha by implanting Mr. Burnett's telephone number on Mutual of Omaha's website only to file a TCPA suit.

To the contrary, Mr. Burnett is a 70 year old Southport, North Carolina resident who filed this lawsuit because Mutual of Omaha's incessant, unsolicited calls irritated him. Mr. Burnett did nothing to cause Mutual of Omaha to start calling him, and, despite his best efforts, Mutual of Omaha refused to stop calling him.

Now, after calling Mr. Burnett more than 100 times after he sent them a letter pleading for the calls to stop, Mutual of Omaha insinuates that Mr. Burnett visited Mutual of Omaha's website in January 2026 and implanted his telephone number with a series of other false information in an effort to generate a TCPA lawsuit. That is patently false.

Mr. Burnett did not visit Mutual of Omaha's website in January of 2026 before he started receiving Mutual of Omaha's calls. (Mr. Burnett does not believe he ever visited Mutual of Omaha's website before the filing of this lawsuit.) He also has never directed anyone to input his number on Mutual of Omaha's website and has no knowledge of anyone ever doing so.

*Second*, Mutual of Omaha argues that bifurcation is warranted based on a recent ruling in an Oregon case, *Wilson v. Freeway Insurance Services of America, LLC*, No. 6:25-cv-01869-MC (D. Or. Aug. 19, 2026), which Mutual of Omaha claims "concerns Plaintiff's counsel of record

here, and which calls into question whether Plaintiff's counsel of record is adequate." But Plaintiff's counsel was not counsel of record (or otherwise involved) in *Freeway*; he did not brief Freeway's motion to deny class certification or appear at the hearing on that motion. Nor are any of the attorneys involved in *Freeway* counsel in this action. Plaintiff's counsel has not engaged in any fraud, and has not been accused of fraud in that proceeding. Mutual of Omaha instead attempts to link Plaintiff's counsel to *Freeway* through his appearance in *Wilson v. PacifiCorp*, No. 6:24-cv-01956-MC (D. Or.), a separate action that had been settled on a class action basis and that the Oregon court joined with thirteen other Wilson cases for purposes of class certification. The stay in *PacifiCorp* flowed from the *Freeway* court's class-certification order, not from a separate finding concerning Plaintiff's counsel's conduct in *PacifiCorp*. Accordingly, Mutual of Omaha's assertion that the *Freeway* record calls Plaintiff's counsel's adequacy into question rests on an inference the record does not support.

There is therefore no basis in the record in this case or any proceeding in Oregon for bifurcating discovery and delaying Plaintiff from pursuing his putative class claim while he faces one way discovery into Mutual of Omaha's speculative assertions. And there is likewise no basis for the type of attorney-client privileged or third party discovery into the same issues that Mutual of Omaha previews.

The Court should therefore deny Mutual of Omaha's request for bifurcation.

**Defendant:**

Defendant requests phased discovery, with the initial phase limited to the merits of Plaintiff's individual claim. That includes the threshold, plaintiff-specific issue that may resolve this case: who submitted the lead bearing Mr. Burnett's telephone number. Resolving the lead's origin may dispose of the case by summary judgment, reveal that the claims are subject to a forum-

selection provision, and/or show that Plaintiff's claims are not subject to class treatment because the investigation necessary for Plaintiff would be necessary for every other request for contact received by Mutual. Defendant proposes conducting this initial discovery on an expedited basis, such that its proposal will not otherwise impact the case timeline:

- The first 90 days of discovery will be limited to expedited discovery on Plaintiff's individual claim, including the origin of the lead and any arbitration agreement and class-action waiver associated with the submission ("Phase One");
- Defendant will be permitted to file a motion to dismiss for improper venue and/or a dispositive motion 45 days after the conclusion of Phase One; and
- If the Court denies the motion, the parties will submit a proposed scheduling order for further proceedings within 14 days of that ruling, including class discovery if Plaintiff—having first resolved the origin of his own claim—can show that there is any basis for that.

Defendant's proposal is the most just and efficient course for several reasons.

First, it is more efficient and sensible to resolve the viability of Mr. Burnett's own claim before subjecting the parties to burdensome classwide merits discovery, as a legion of authority in this Circuit and other courts has recognized. *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650–51 (4th Cir. 2018) (approving 75-day limited jurisdictional discovery in TCPA case before ruling on *Yearsley* immunity defense; establishing that limited, focused discovery is appropriate when jurisdictional facts are disputed); *Akselrod v. MarketPro Homebuyers LLC*, 2021 WL 100666, at *2 (D. Md. Jan. 12, 2021) (granting bifurcation of liability and class discovery in TCPA case; finding ATDS capability and telephone solicitation status distinct from class certification prerequisites); *Banks v. Bio Tr. Nutrition, LLC*, 2026 WL 678871, at *3–4 (D. Colo. Jan. 20, 2026) (holding that what "[p]laintiff saw and did on [defendant's] website in 2020, how

consent was presented and captured . . . and how her phone number entered the 2024 BioTrust marketing campaigns" was sufficiently distinct from class discovery to justify bifurcation); *Cameron v. CHW Grp., Inc.*, 2025 WL 2336513, at *2–3 (D. Utah Aug. 13, 2025) (recognizing that TCPA claims present unique issues, including the class representative's consent, that have prompted courts to "recognize[ ] the efficiencies of bifurcated discovery in TCPA class actions"); *Fania v. Kin Ins., Inc.*, 2024 WL 2607303, at *2–3 (E.D. Mich. May 24, 2024) (phasing individual and class discovery in a TCPA prerecorded calls class action and finding "bifurcating discovery into plaintiff specific and class wide phases is the most efficient way to proceed").

Second, phased discovery serves the interests of proportionality. Absent phasing, Defendant would bear the substantial and potentially unnecessary burden of classwide merits discovery into multi-year dialing logs, customer lists, and complaint files before we even know if Plaintiff himself has an actionable claim or is subject to a forum-selection clause. *See, e.g.*, *Banks*, 2026 WL 678871, at *6 (finding bifurcation proportional given burden of premature classwide TCPA discovery); *Book v. Flexpro, L.L.C.*, 2023 WL 9471634, at *1 (M.D. Fla. Sept. 11, 2023) (phasing discovery in a TCPA class action to avoid forcing the massive expense of class discovery on the defendant). That burden is especially unwarranted here, where Defendant's investigation indicates that the underlying lead is of questionable origin. Expanding discovery into classwide merits data before resolving that threshold issue would be premature and unduly intrusive. The threshold questions concerning Plaintiff's individual claim—the authenticity of the subject lead, whether Plaintiff consented to or manufactured the calls, whether he is subject to a forum-selection clause, and his resulting standing—have no overlap with the classwide merits discovery Plaintiff will seek, which includes years of lead forms and outbound call data—discovery that only serves to impose expense and *in terrorem* pressure on a defendant that only calls consenting persons.

Resolving whether Plaintiff's claim is actionable at the outset will "simplify the case and [] save both parties the time and expense of class discovery[.]" *Akselrod*, 2021 WL 100666, at *1.

Finally, phasing discovery in the manner described above is warranted in light of a recent ruling from the U.S. District Court for the District of Oregon that concerns Plaintiff's counsel of record here, which both calls their adequacy into question and highlights the uncertifiability of a case that turns on a single wrong number entered into a lead form. On August 19, 2026, Chief Judge McShane granted an affirmative motion brought by the defendant to deny class certification in fourteen consolidated TCPA class actions brought by the same plaintiff, Chet Wilson—including *Wilson v. PacifiCorp*, No. 6:24-cv-01956-MC (D. Or.), where Plaintiff's counsel here is counsel of record. *See* Minutes of Proceeding, *Wilson v. Freeway Ins. Servs. of Am., LLC*, No. 6:25-cv-01869-MC, ECF No. 47 (D. Or. Aug. 19, 2026) (granting motion to deny class certification); *id.*, ECF No. 45 (joining fourteen cases brought by Mr. Wilson for purposes of class certification); *PacifiCorp*, ECF No. 42 (granting Mr. Kaufman's motion for leave to appear *pro hac vice*).

Plaintiff notes that his counsel did not appear in *Freeway* and that he neither briefed nor argued the motion decided there. That is true but beside the point. Chief Judge McShane's concern was not about the facts of the *Freeway* case itself. That's why he, in coordination with the other district judges in the District of Oregon, consolidated fourteen cases against unrelated defendants (previously pending in front of other judges) into one action for purposes of certification: because the court was "concerned about . . . the manner in which these cases are coming to the Court," about "ethical issues from some of the attorneys involved," and "about whether criminal fraud is taking place." *See Wilson* Tr. of Hearing on Mot. to Deny Class Certification at 42:11–22. By "these cases," the court was referring to Mr. Wilson's dozens of TCPA cases, many of which Mr.

Kaufman was counsel in. After receiving hundreds of pages of briefing and hours of oral argument (*see Freeway*, ECF Nos. 19, 28, 32, 42), he declared the $850,000 class settlement that Mr. Kaufman negotiated in *PacifiCorp*—another Chet Wilson case where Mr. Kaufman was counsel of record—a "legal impossibility," *Wilson* Tr. at 78:4–8, stayed thirteen of the consolidated cases, and ordered the plaintiff and the law firm generating his claims to preserve all related devices and documents. *Id.* at 78:10–79:6 (preservation orders and stay).

The ruling's primary basis is a business model in which a handful of plaintiffs' counsel who work together, including Mr. Kaufman, file TCPA claims as "putative class actions" for the "extortion premium." *See Wilson* Tr. at 36:8–11. In other words, they use the class allegations as leverage to extract enormously outsized *individual* settlements—settlements in which the client's recovery is capped at statutory damages while, by contract, every dollar above that cap belongs to counsel, who is thus paid most when the class recovers nothing. On the rare occasion a class settlement issues, it is comprised largely of attorneys' fees in exchange for a low-value, broad-release bargain selling the defendant cheap classwide peace while absent members receive a nominal sum, if anything.

After denying certification across fourteen cases, Chief Judge McShane further denied the lawyers' attempt to dismiss their own client's claims and instead ordered discovery so the defendant could build a record for an anticipated sanctions motion. *Freeway*, ECF No. 47; *Wilson* Tr. at 76:12–25, 78:10–24.

The *Wilson* record also mirrors the threshold issue here. Wilson maintained that someone else submitted an insurance-quote lead form through a third-party website under another person's name while listing his number. *See Freeway*, ECF No. 19 at 8, 10, 12. In an effort to identify who actually submitted that one form, Freeway served written discovery, requested an inspection of

Wilson's phone, issued third-party subpoenas, and retained a former FBI agent who traveled to two California towns. *Id.* at 24–25, 33; *Wilson* Tr. at 24:5–10. And Freeway *still* could not locate the person named on the form. In the end, Wilson's own counsel conceded that discovery had shown that "someone unrelated to him has filled out a form" and "typed his" number. *Wilson* Tr. at 55:22–56:7. Freeway, in turn, showed that resolving who submitted each lead would require "the same type of burdensome, individualized investigation." *Freeway*, ECF No. 19 at 25; *see id.* at 32–33; *Wilson* Tr. at 24:1–4, 24:21–25. Chief Judge McShane then denied certification, finding "issues of typicality," "predominance," and "adequacy," *id.* at 76:12–25; *Freeway*, ECF No. 47. The same threshold issue exists here: who submitted the January 17, 2026 "Jesse M. Brooks" lead bearing Plaintiff's number. *Wilson* illustrates why that inherently individualized inquiry should be resolved before the parties incur the expense of classwide merits discovery.

Under much less suspect circumstances, courts routinely phase discovery because doing so is equitable, efficient, non-prejudicial, and justified. *See Pompilio v. Indra Energy*, No. 1:25-cv-02234, ECF No. 34 (N.D. Ill. June 26, 2025) ("In light of the robust discussion of this [threshold] issue provided by Defendant, the Court believes that phased discovery is appropriate and adopts the phased discovery schedule."); *Moore v. Charter Commc'ns, Inc.*, No. 3:20-cv-01867, ECF No. 24 (D. Conn. Mar. 24, 2021) (noting in a TCPA class action that "discovery will be bifurcated into two phases and the first phase is devoted to plaintiff's individual claim"); *Williams v. Tax Def. Network, LLC*, No. 2:20-cv-00312, ECF No. 15 (N.D. Ind. Nov. 5, 2020) (similar); *MacDonald v. R&H Indus., LLC*, No. 2:20-cv-00682, ECF No. 17 (D. Ariz. July 17, 2020) (similar); *Connor v. Charter Commc'ns, Inc.*, No. 6:19-cv-2008, ECF No. 31 (D.S.C. Dec. 5, 2019) (similar).

**(c)** **Plaintiff**: The maximum number of interrogatories by each party to any other party is 25 interrogatories, consistent with Rule 33. Answers due 30 days after service,

consistent with Rule 33(b)(2), unless otherwise agreed by the parties.

**Defendant**: Phase One shall consist of 25 interrogatories by each party to any other party, consistent with Rule 33. Answers due 30 days after service, consistent with Rule 33(b)(2).

**(d)** **Plaintiff**: The maximum number of requests for admission is 25 requests for admission by each party to any other party. Responses due 30 days after service, consistent with Rule 36(a)(3), unless otherwise agreed by parties.

**Defendant**: Phase One shall consist of 25 requests for admission by each party to any other party (exclusive of requests directed to the authenticity of documents). Responses due 30 days after service, consistent with Rule 36(a)(3).

**(e)** **Plaintiff**: The maximum number of depositions by each party is 4 per party.

**Defendant**: Phase One shall consist of Mr. Burnett's deposition, 3 depositions of Mutual on issues limited to Mr. Burnett's individual claims, and third-party discovery as appropriate.

**(f)** Depositions are limited to one day of seven hours, consistent with Rule 30(d)(1).

**(g)** **Plaintiff**: Plaintiff proposes the following expert deadlines:

Affirmative expert disclosures: June 4, 2027

Rebuttal expert disclosures: July 2, 2027

Expert discovery cut off: August 2, 2027

**Defendant**: If any dispositive motion following Phase One is denied, the parties will submit a further stipulation and schedule containing a deadline for opening and rebuttal expert disclosures.

**(h)** Supplementations under Rule 26(e) shall be made continuously and in any event no

later than 30 days before the close of discovery.

**(i)** The parties have discussed preservation and anticipate that relevant ESI will be produced, including call detail records, dialer data, lead and consent records, and audio files. Requests for ESI and responses must be reasonably targeted, clear, and as specific as practicable. The parties will endeavor to produce ESI in native form or in unitized, fixed-image format (e.g., .pdf or .tiff) and will confer regarding the format for structured call data and audio files. Should any ESI dispute arise, the parties will meet and confer before seeking the Court's intervention.

**(j)** If a party believes privileged or protected material was inadvertently produced, it will advise the producing party; recall, sequester, or return of such material is without waiver of any claim of privilege or protection, and the mere fact of inadvertent disclosure is insufficient to waive any such claim. The parties will meet and confer before any motion challenging a privilege claim. The parties intend their agreement to be entered as an order under Federal Rule of Evidence 502(d); Rule 502(b) will govern disputes about inadvertence. The parties further anticipate that a protective order will be needed and will confer on its terms.

4. Other Items:

**(a)** The parties request a meeting with the Court before entry of a scheduling order, on October 13, 2026.

**(b)** The parties request that pretrial conference dates be set by the Court at a time consistent with the schedule proposed herein.

**(c)** **Plaintiff**: Final dates for the plaintiff to amend pleadings or to join parties: November 6, 2026

**Defendant**: If any dispositive motion following Phase One is denied, the parties will submit a further stipulation and schedule containing a deadline for Plaintiff to amend his complaint.

**(d)** **Plaintiff**: Final dates for the defendant to amend pleadings or to join parties: November 6, 2026

**Defendant**: If any dispositive motion following Phase One is denied, the parties will submit a further stipulation and schedule containing a deadline for Defendant to amend its Answer. Defendant reserves the right to amend its Answer and to add parties, including for purposes of apportioning fault to third parties.

**(e)** **Plaintiff**: Dispositive motions, including motions related to class certification, must be filed by August 25, 2027.

**Defendant**: Dispositive motions shall be filed 45 days after the Court rules on Defendant's motion to dismiss for improper venue or another dispositive motion. Defendant reserves the right to move on threshold issues, including Article III standing and to compel arbitration, at an earlier date.

**(f)** Settlement prospects cannot be evaluated at this early stage. Defendant denies liability. The parties are willing to discuss settlement following threshold discovery.

**(g)** The parties will submit Rule 26(a)(3) witness lists and exhibit lists and designate witnesses whose testimony will be presented by deposition 30 days before trial.

**(h)** The parties will file objections to pretrial disclosures within 14 days after the Rule 26(a)(3) disclosures, consistent with Rule 26(a)(3)(B).

**(i)** The parties respectfully propose that the Court set a trial date following the

resolution of Phase One of discovery, if any, class certification, and dispositive motions. The parties estimate a trial length of 3–5 days, subject to whether a class is certified.

**(j)** **Plaintiff**: Plaintiff proposes that class certification be briefed at the same time as any summary judgment or other dispositive motion.

**Defendant**: Defendant proposes that class-certification briefing be scheduled following the class-discovery phase, if any.

**(k)** The parties do not consent to the exercise of jurisdiction by a Magistrate Judge for all purposes at this time.

Date: September 30, 2026

/s/ Avi R. Kaufman

Avi R. Kaufman
kaufman@kaufmanpa.com
KAUFMAN P.A.
237 South Dixie Highway, Floor 4
Coral Gables, Florida 33133
Telephone: (305) 469-5881

/s/ Ryan Duffy

Ryan Duffy
NC Bar #55904
The Law Office of Ryan P. Duffy, PLLC
96 East Catawba Street, Suite 6
Belmont, North Carolina 28012
ryan@ryanpduffy.com
Telephone: (704) 741-9399
Fax: (980) 218-0855

*Local Civil Rule 83.1(d) Attorney for Plaintiff*

*Attorneys for Plaintiff and the putative Class*

Date: September 30, 2026

/s/ Melanie Ng Silva

Melanie Ng Silva, State Bar No. 59016
mngsilva@wtlaw.com
**WATSTEIN TEREPKA LLP**
218 Northwest 24th Street 3rd Floor
Miami, Florida 33127
Telephone: (404) 600-1240
Facsimile: (404) 537-1650

Ryan D. Watstein*
ryan@wtlaw.com
Oyinkansola Y. Muraina*
omuraina@wtlaw.com
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 418-8307
Facsimile: (404) 537-1650

Nathaniel Haas*
nhaas@wtlaw.com
**WATSTEIN TEREPKA LLP**
999 N. Pacific Coast Highway, Suite 525
El Segundo, California 90245
Telephone: (213) 526-1880
Facsimile: (404) 537-1650
*special appearance

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September 2026, I have electronically filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all counsel of record and other CM/ECF participants.

*/s/ Melanie Ng Silva*
Melanie Ng Silva